IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


**CULVESTA ANN PRUITT,**                    Case No. 1:16 CV 2927

    Plaintiff,

    v.                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                MEMORANDUM OPINION AND ORDER


## INTRODUCTION

Plaintiff Culvesta Ann Pruitt ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in December 2013, alleging a disability onset date of April 15, 2010. (Tr. 130-31, 218-23). Her claims were denied initially and upon reconsideration. (Tr. 104-31, 132-63). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). *See* Tr. 96. Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 1, 2015. (Tr. 45-85). On January 27, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 29-40). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20

C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on December 6, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

Relevant Medical Evidence[1]

In April 2013, Plaintiff underwent a consultative examination with Richard Halas, M.A. (Tr. 353-57). Plaintiff reported she had graduated from high school in "special classes" and had maintained average grades. (Tr. 353). Plaintiff reported a past history of drug abuse treatment, but no mental health treatment. (Tr. 354). Mr. Halas observed Plaintiff was cooperative, but tense and anxious. *Id.* Her speech was "reasonably fluent and articulate". (Tr. 355). Plaintiff had a flat affect and a depressed mood, as well as low energy levels. *Id.* Mr. Halas observed Plaintiff had "some mild symptoms of anxiety". *Id.* Plaintiff reported activities of daily living including making breakfast, cooking, cleaning, shopping and laundry. (Tr. 356). She also reported her children "help her when she needs it." *Id.* Mr. Halas assessed depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified, polysubstance abuse, and borderline personality disorder with paranoid traits and schizoid features. *Id.* He assigned a Global Assessment of Functioning ("GAF") score of 55, indicating moderate symptoms.[2] (Tr. 357). For his functional assessment, Mr. Halas

---

1. The undersigned summarizes the records related to Plaintiff's arguments, which focus on her mental impairments.
2. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM—V") (noting recommendations "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

noted Plaintiff would have "little or no difficulty" in understanding, remembering, and carrying out instructions; he noted Plaintiff was "estimated to have low/average intellect". *Id.* He also opined Plaintiff would have "little or no difficulty" in maintaining attention and concentration, and maintaining persistence and pace to perform simple or multi-step tasks. *Id.* He opined Plaintiff's "[p]ersonality issues, depression, and anxiety" were likely to cause "significant problems" in responding appropriately to supervisors and coworkers in a work setting. *Id.* She would also have "some problems" in responding appropriately to work pressures. *Id.*

From September 28, 2013 through October 1, 2013, Plaintiff was admitted to Lutheran Hospital for suicidal ideation. (Tr. 362-74). On admission, Plaintiff also reported hearing voices. (Tr. 365). Plaintiff's discharge summary stated her hospital course was "[u]neventful with improving symptomology" and she was "started on Zoloft and Seroquel." (Tr. 362). Her "affect was markedly improved" on discharge. *Id.* Her discharge diagnosis was major depressive disorder, single episode, severe without psychotic symptoms. (Tr. 363).

In October 2013, Plaintiff started counseling at Connections. (Tr. 666-67).

The following month, in November 2013, Plaintiff underwent an initial psychiatric evaluation at Connections with Grace Herwig, MSN, RN, CS, LCDC III. (Tr. 378-82). Plaintiff reported a ten year history of auditory hallucinations, as well as depression. (Tr. 378). Plaintiff reported hearing voices "whispering and talking", paranoia, and not going outside. (Tr. 378). She had a history of physical and verbal abuse by her father. *Id.* On examination, Ms. Herwig noted Plaintiff was moderately disheveled, severely mistrustful and withdrawn, but had average eye contact and activity, and clear speech. (Tr. 379). She had moderate persecutory and suicidal thoughts. *Id.* She had severe auditory, and moderate visual hallucinations, but a logical thought process. *Id.* Her mood was depressed, angry, and irritable, and she had a labile affect. *Id.* Her

behavior was hyperactive, agitated, and cooperative. *Id.* She was oriented, able to abstract, and had moderate limitations in attention, concentration, and memory. *Id.* She was estimated to have average intelligence. *Id.* Ms. Herwig continued Plaintiff on Seroquel and Zoloft. (Tr. 381).

Plaintiff returned to Ms. Herwig in December 2013. (Tr. 376-77). Ms. Herwig noted Plaintiff was sleeping in the waiting room, and that she reported thoughts of suicide and a sense of hopelessness. (Tr. 376). Plaintiff was tearful, paranoid, and had a depressed mood. *Id.* Ms. Herwig increased Plaintiff's Seroquel dosage. *Id.*

In January 2014, Plaintiff's daughter reported Plaintiff's mood was "improved, with less crying and less anger and irritability." (Tr. 404). Plaintiff "acknowledge[d] she [was] crying less but otherwise seem[ed] unaware of any improvement." *Id.* At Plaintiff's next visit in February 2014, Plaintiff reported one episode of crying for half a day. (Tr. 401). Plaintiff's daughter reported Plaintiff was sleeping more than twelve hours per day, and performing tasks and speaking more slowly. *Id.* Plaintiff also described paranoid thoughts. *Id.*

In March 2014, Plaintiff "look[ed] brighter" and reported her mood had been better for the prior two weeks. (Tr. 399). She still reported being "fearful" around people, and worrying that people talk about or would harm her. (Tr. 399). Plaintiff requested Abilify for her mood, and Ms. Herwig prescribed it. (Tr. 399-400).

In April 2014, Plaintiff was admitted to the hospital after attempting suicide by overdosing on her prescribed Seroquel. (Tr. 439-40). Plaintiff was "a little paranoid about being in the hospital" and reported continuing, though lessened, depression on her current medications. (Tr. 440). She also reported "the last time she heard a voice was in November." *Id.* On examination, Plaintiff was pleasant, interactive, oriented, with appropriate speech and mood. (Tr. 441). Her insight was limited, judgment was lacking, and memory was mildly impaired. *Id.* Her thought form

was circumstantial and evasive, and she had auditory hallucinations, but no suicidal ideations. *Id.* Plaintiff was assessed with major depressive disorder, recurrent, severe with psychotic symptoms, rule out bipolar disorder with psychotic symptoms. (Tr. 439). She was continued on her medications. *Id.*

Later in April, Plaintiff reported she as doing well "in terms of not withdrawing to her room", attending church, and visiting with family. (Tr. 579). Plaintiff also told Ms. Herwig about her hospitalization. *Id.* Ms. Herwig noted "Her pattern is that she takes care of everyone and sets no limits until she is so frustrated that she either verbally explodes or in this case impulsively overdosed." *Id.* Plaintiff agreed to counseling and to continue her medications. *Id.* In May, Plaintiff reported she "continue[d] to improve" and was getting out of the house most days. (Tr. 577).

In June 2014, Plaintiff began counseling with Brenda Dillane, LPCC. (Tr. 649-50). She reported depressive symptoms with auditory hallucinations and suicidal ideations at times. (Tr. 649). Ms. Dillane noted Plaintiff was "pleasant, cooperative, and engaged in [the] therapeutic process." (Tr. 650). She reported suicidal ideations "at times" but was "able to overcome them with phone calls to friends, prayer, and church attendance." *Id.*

In a July 2014 counseling session with Ms. Dillane, Plaintiff reported she was "not so depressed" and had been deliberately taking actions to avoid staying in her room such as going to the movies, and going to the park with a friend. (Tr. 641). Later that month, she reported to Ms. Herwig that she believed medications and counseling were helping her. (Tr. 575). Plaintiff was "out of her room more, out of doors in her yard"; she was crying less, but still fairly often. *Id.* Ms. Herwig increased Plaintiff's Abilify dosage. *Id.*

In an August 2014 counseling session, Plaintiff reported: "I think if it weren't for you and my kids, I woulda done taken my life . . . now I just turned it around, changed my thoughts." (Tr. 634). Plaintiff was also "[v]ery pleased with her ability to take bus and her literacy classes." *Id.*

In September 2014, Plaintiff reported mood improvement with Abilify, but weight gain. (Tr. 573). She had also had a recurrence of hearing voices and seeing someone in her room at night. *Id.* Ms. Herwig increased Plaintiff's Seroquel dosage, and instructed her to take Abilify before bedtime to help with weight gain. (Tr. 573-74). At a counseling session that month, Ms. Dillane noted Plaintiff was able to acknowledge her significant progress in the past year. (Tr. 630).

In October, Plaintiff reported increased depression over the past five days with an increase in suicidal thoughts. (Tr. 570). She also reported her auditory hallucinations "are down to a whisper but they do speak about suicide." *Id.* She continued to report spending more time with her family than she had in the past, and was able to take the bus to her appointment. *Id.* Ms. Herwig increased Plaintiff's Abilify dosage. (Tr. 570-71).

In November, Plaintiff reported "she felt better within a few days of increasing the dosage of [A]bilify" and her mood was "much improved." (Tr. 568). She continued to hear whispers, and her children said she talked to herself. *Id.* Ms. Herwig increased Plaintiff's Seroquel dosage. (Tr. 568-69).

At a February 2015 counseling session, Plaintiff reported her medications "seem[ed] like they're working better". (Tr. 613). She still heard voices, but "they are really low and [she could] talk over them." *Id.* Plaintiff also reported fewer bouts of tearfulness. *Id.* Plaintiff's mother had praised her for taking the bus by herself; Plaintiff was excited about the prospect of living alone and looking forward to working in the garden. *Id.*

In March 2015, Plaintiff reported continued improvement to Ms. Herwig. (Tr. 566). She had taken the bus alone, and was still hearing whispering, "but it is very low". *Id.* She believed her family was talking about her, but her mother reassured her they were not, and she was "trying to learn to ignore this". *Id.* Plaintiff was still experiencing weight gain as a side effect, but she was working to buy more healthy foods and her daughter was taking her to exercise because she wished to stay on her current medications. *Id.* At a March 2015 session with a different provider, Plaintiff reported she was "currently going to community college and loves to cook." (Tr. 651).

In May 2015, Plaintiff requested to change her medication to Abilify Maintaina because she was living alone, and had missed doses. (Tr. 564). Ms. Herwig noted Plaintiff's "thinking seem[ed] clear and organized" but that "she seem[ed] to need supervision to fulfill basic responsibilities of self care." *Id.* Ms. Herwig prescribed Abilify Maintaina. (Tr. 565). At a counseling session the same day, Plaintiff reported attending college and that it was "going ok". (Tr. 604). She was "getting help for math at the culture center and culinary classes", and planned to start cooking the following month. *Id.* Plaintiff reported some stress from family moving away, but that her classes were "going well", and that she had been volunteering at the library. *Id.*

At a counseling session in June 2015, Ms. Dillane noted Plaintiff's mood "appeared bright" and she was alert and oriented. (Tr. 601). She was no longer attending reading at the library, but was still visiting. *Id.* She also went to the culture center Mondays and Wednesdays for math, language, and reading, and had culinary classes on Tuesday, Thursday, and Friday. *Id.* Ms. Dillane noted Plaintiff was "pleasant, cooperative, and engaged in [the] therapeutic process" as well as reported benefits from medications. *Id.*

In July 2015, Ms. Dillane noted progress made toward Plaintiff's goals and objectives. (Tr. 680). Ms. Dillane observed Plaintiff was alert and oriented and her mood was stable. *Id.* Plaintiff

was continuing to "get help with reading" and taking culinary classes. *Id.* Notes from that same month with a different provider indicate Plaintiff was "friendly and actively participated in discussion" and denied hallucinations. (Tr. 670); *see also* Tr. 672 ("alert and friendly").

In August 2015, Plaintiff reported improvement, stating she was "fine". (Tr. 698). She was "uneasy" about a plan to live independently, but described her plan to live within walking distance of her daughter. (Tr. 698). She reported her auditory hallucinations were down to a whisper, and her mood was good. *Id.* At an appointment with a different provider in August 2015, Plaintiff was observed to be "alert and friendly", "actively participated in discussion" and denied hallucinations. (Tr. 674-75, 676-77). Later in August 2015, Ms. Dillane observed Plaintiff was "pleasant, cooperative, and engaged the therapeutic process", alert and oriented, with a stable appearing mood. (Tr. 686). She was similarly alert and oriented with a stable, but "subdued mood, which she attributed to very poor sleep" toward the end of the month. (Tr. 688). Plaintiff noted she "realized she did not take her meds" the night before. *Id*.

In September 2015, Ms. Dillane again noted Plaintiff was alert and oriented, and her mood was stable. (Tr. 690). That same day, Plaintiff again "actively participated in discussion" with another provider; she was "alert and attentive" and denied hallucinations. (Tr. 678). Plaintiff "admit[ted] to having stressors, however, report[ed] that overall she fe[lt] stable." *Id*.

Plaintiff saw Ms. Dillane three times in October 2015. (Tr. 692-97). At each visit, Plaintiff was alert and oriented, with a stable, or improved, mood. (Tr. 692, 694, 696). Plaintiff was "pleasant, cooperative, and engaged in the therapeutic process." (Tr. 696).

*Opinion Evidence*

In January 2014, Robyn Hoffman, Ph.D., reviewed Plaintiff's records at the request of the state agency. (Tr. 111-14; 125-27). She opined Plaintiff was moderately limited in the ability to

understand, remember, and carry out detailed instructions, as well as maintain attention and concentration for extended periods, noting that she "appear[ed] capable of simple 1-3 step tasks which do not involve[] timed or speeded activities or large production quantities." (Tr. 112, 125). She also opined Plaintiff "appear[ed] capable of work in an environment w/ only limited superficial interaction w/ coworkers, supervisors, and the general public." (Tr. 113, 126).

In February 2014, Ms. Herwig completed a Mental Impairment Questionnaire. (Tr. 390-93). She noted she had seen Plaintiff monthly for three months and had assessed major depressive disorder, severe, and rule out schizoaffective disorder. (Tr. 390). She noted Plaintiff had a "[p]artial response to treatment so far". *Id.* With regard to understanding and memory limitations, Ms. Herwig opined Plaintiff was seriously limited, but not precluded from understanding and remembering short and simple instructions, but would be unable to meet competitive standards in remembering locations and work procedures, or detailed instructions. (Tr. 391). With regard to concentration and persistence limitations, she opined Plaintiff was unable to meet competitive standards, or had no useful ability to function in every category except making "simple work-related decisions" (for which she found Plaintiff was seriously limited, but not precluded). *Id.* With regard to social interaction, Ms. Herwig opined Plaintiff had a limited but satisfactory ability to ask simple questions, or accept instructions and respond appropriately to criticism from supervisors, but would be unable to interact with the general public, and unable to meet competitive standards in getting along with coworkers or peers. (Tr. 392). She also assessed severe adaptation limitations. *Id.* Ms Herwig opined Plaintiff did not have a low IQ or reduced intellectual functioning. *Id.* She further opined Plaintiff would miss more than four days of work per month, and would be off-task 25% or more of a work day. (Tr. 393).

In April 2014, state agency reviewing psychologist Katherine Fernandez, Psy.D., reviewed Plaintiff's records and affirmed Dr. Hoffman's conclusions. (Tr. 142-44, 157-59). Dr. Fernandez noted specifically: "With med adjustments and ongoing care, she is doing better. Per 4/14 note, mood is better, she is crying less, seems brighter. The initial level MRFC is affirmed." (Tr. 144, 159).

In July 2015, Ms. Herwig completed a second Mental Impairment Questionnaire. (Tr. 489-90). She again opined Plaintiff had no useful ability to function or was unable to meet competitive standards in most listed categories regarding concentration, social interaction, and adaptation. *Id.* the clinical findings in support of her opinion were: "tiredness, forgetfulness, continues to get auditory hallucinations that client tries to ignore, poor concentration." (Tr. 489).

Also in July 2015, Ms. Dillane completed a Mental Impairment Questionnaire. (Tr. 487-88). She noted she had seen Plaintiff approximately twice per month beginning in June 2014. (Tr. 487). She noted Plaintiff's condition was chronic, Plaintiff was "forgetful" and that "auditory hallucinations continue despite psychotropic medications." *Id.* She opined Plaintiff had no useful ability to function, or was unable to meet competitive standards, in every area of sustained concentration or persistence limitations. *Id.* Plaintiff was seriously limited but not precluded from remembering locations and work-like procedures, but unable to meet competitive standards in the ability to understand and member short and simple instructions, and had no useful ability to function in understanding and remembering detailed instructions. (Tr. 488). She also found Plaintiff was unable to meet competitive standards or had no ability to function in adaptation limitations. *Id.* Ms. Dillane opined Plaintiff would be absent form work three days per week, and be off task for 40 to 80 percent of a workday. *Id.*

Personal Background and Testimony

Plaintiff was born in June 1961, making her 48 years old on her alleged disability onset date. (Tr. 39).

At the time of the hearing, Plaintiff lived with two of her five children (ages 19 and 21), and her two-year-old grandchild. (Tr. 55, 58). Plaintiff did some housework, but needed help to make sure it was done correctly. (Tr. 55-57, 70). Plaintiff testified she did not drive. (Tr. 57).

Plaintiff testified she graduated from high school. (Tr. 50). She reported she had been in special education classes. (Tr. 62).

Plaintiff testified she had last worked in 2010 at Burger King and the Salvation Army. (Tr. 50). She testified she was fired from various prior jobs due to performance issues. (Tr. 50-55, 63-64). Plaintiff testified she liked working at Burger King, but was let go due to her "episodes" and "hearing voices." (Tr. 59).

During the day, Plaintiff spent time in her room, and watched television. (Tr. 57). She estimated she left house once per week with her daughter, either to the park, or to her daughter's house. (Tr. 58). She was starting to go to church with her daughter. (Tr. 58).

Plaintiff testified to hearing voices, and that medication helped make them not as loud. (Tr. 59-60). The medications made the voices "like a low whisper". (Tr. 61). When she heard voices, they told her to hurt herself, and she had been hospitalized for this. (Tr. 60).

To get to her medical appointments, Plaintiff had a special pass that allowed someone to ride with her. (Tr. 67-68). Plaintiff testified she was unable to ride the bus by herself because she would get lost. (Tr. 68).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. She testified that an individual limited in the way ultimately found by the ALJ could perform jobs of merchandise marker, mailroom clerk, and housekeeping cleaner. (Tr. 74-75).

ALJ Decision

In her written decision dated January 27, 2016, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016. (Tr. 31). She found Plaintiff had engaged in substantial gainful activity from July through September 2012, but there had been a continuous twelve month period during which she had not engaged in substantial gainful activity. (Tr. 31-32). The ALJ found Plaintiff had severe impairments of disorders of the right foot/ankle, affective disorders, anxiety disorder, personality disorders, and polysubstance abuse; however, these impairments—individually or in combination, did not meet or medically equal the severity of a listed impairment. (Tr. 32). The ALJ concluded Plaintiff had the residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except push/pull with right lower extremity occasionally; capacity to remember simple tasks; capacity to work in an environment with only limited and superficial interaction with co-workers, supervisors and the general public; and capacity to work in a relatively static environment where there are no strict time or production demands.

(Tr. 34).

The ALJ then found Plaintiff had no past relevant work, was born in June 1961 and was 48 years old ("an individual closely approaching advanced age") on her disability date, and had a high school education and was able to communicate in English. (Tr. 39). Based on the testimony of the VE, the ALJ concluded Plaintiff could perform jobs existing in significant numbers in the national economy. (Tr. 39). Therefore, she found Plaintiff not disabled. (Tr. 40).

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.       Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.       Does the severe impairment meet one of the listed impairments?

4.       What is claimant's residual functional capacity and can claimant perform past relevant work?

5.       Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges the ALJ erred in three ways: 1) in failing to discuss her borderline age situation; 2) in failing to appropriately evaluate the reviewing physicians' opinions despite assigning them "great weight"; and 3) in failing to properly evaluate the opinions of treating providers Ms. Herwig and Ms. Dillane. The Commissioner responds that the ALJ did not err, and her opinion is supported by substantial evidence. For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Borderline Age

Plaintiff first objects that the ALJ, contrary to the regulations, "mechanically" applied the age guidelines, even though she fell within a "borderline" age situation. The undersigned concludes the ALJ did not err in this regard.

After conducting the hearing on December 1, 2015 (Tr. 45-85), the ALJ issued her decision on January 27, 2016. (Tr. 29-40). Plaintiff was born June 10, 1961 (Tr. 39), making her 54 years old at the time of the ALJ's decision, placing her in the "closely approaching advanced age" (ages 50-54) category. *See* Tr. 39; 20 C.F.R. §§ 404.1563(d), 416.963(d). At the time of the ALJ's decision, Plaintiff was four and a half months shy of turning 55. At age 55, a claimant falls into the "advanced age" category. *See* 20 C.F.R. §§ 404.1563(e); 416.963(e).

The ALJ acknowledged that, if Plaintiff could perform a full range of light work, a finding of not disabled "would be directed by Medical-Vocational Rule 202.13". (Tr. 39). However, because Plaintiff had additional limitations, the ALJ relied on the testimony of the VE to determine what jobs in the national economy Plaintiff could perform. (Tr. 39-40).

Plaintiff relies on 20 C.F.R. § 404.1563(b), which states:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

*Id.* "[N]othing in this language obligates an ALJ to address a claimant's borderline age situation in h[er] opinion or explain h[er] thought process in arriving at a particular age-category determination." *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *Caudill v. Comm'r of Soc. Sec.*, 424 F.App'x 510, 516-17 (6th Cir. 2011); *Bouschor v. Comm'r of Soc. Sec.*,

2016 WL 336099, at * 7 (W.D. Mich.); *Dultmeyer v. Comm'r of Soc. Sec.*, 2014 WL 991900, at * 2 (N.D. Ohio).

In a similar situation, the Sixth Circuit explained that an ALJ was not obligated to analyze the issue of whether a claimant should be considered in a higher age category when he was less than four months from his fifty-fifth birthday:

> This argument is unpersuasive because the ALJ was not required to place Ellison in an age category that did not include his actual age, even though he has the discretion to do so in borderline cases. *See Crady v. Sec'y of Health & Human Servs.,* 835 F.2d 617, 622 (6th Cir.1987). Moreover, the termination of benefits was not based directly on the grids. Instead, reference to the grids merely provided a framework for evaluating the medical and vocational evidence, including the testimony of a vocational expert.

*Ellison v. Comm'r of Soc. Sec.,* 101 F. App'x 994, 996 (6th Cir. 2004).

In *Bowie*, although the court found the ALJ did not have a procedural obligation to address a claimant's borderline age situation, the court explained: "lack of an explanation may in some cases mean that the ALJ's ultimate decision is not supported by sufficient evidence." 439 F.3d at 400-01. The *Bowie* court then gave the following guidance:

> For example, substantial evidence might be lacking where an ALJ, with no explanation, places a claimant in the "younger individual" age category who is 49 years and 11 months, unskilled, sedentary, barely literate, and whose only previous work experience was in the fishing industry. *See* Rule 201.18, App. 2 to Subpart P of 20 C.F.R. § 404; HALLEX II–5–3–2. In that situation, the claimant's additional vocational adversities would be significant and would merit some discussion of proper age categorization in order to meet the substantial-evidence threshold.

*Id.* at 401. Although there has been little development of the short list of examples provided in the HALLEX, this Court finds that, under the particular facts of this case, it was procedurally acceptable for the ALJ not to specifically address in her opinion Plaintiff's "borderline" age situation.

In *Bowie* the Sixth Circuit did not find evidence to support sufficient additional vocational adversities to require the ALJ to discuss the borderline age issue even though Bowie was limited to performing unskilled, sedentary work, and suffered from hypertension, aortic stenosis, and recurrent depression. *Bowie,* 539 F.3d at 396. Additionally, "the mental RFC restrictions to which Plaintiff points . . . do not alone require remand when the ALJ has failed to expressly discuss a 'borderline age situation.'" *Hassan v. Comm'r of Soc. Sec.*, 2015 WL 12681368, at *15 (E.D. Mich.) (citing *Caudill*, 424 F. App'x at 513 (concluding that "[t]he ALJ properly characterized Caudill as an individual 'closely approaching advanced age' rather than a person of 'advanced age[,]' even though the ALJ found that Plaintiff "has poor ability to understand, remember and carry out complex instructions. He has fair ability to understand, remember and carry out detailed but not complex job instructions."). As another court explained:

> Claimant's alleged additional vocational adversities are not significant enough to render the ALJ's ultimate decision unsupported by substantial evidence. The adversities that Claimant asserts are far less severe than those stated in the *Bowie* hypothetical. Here, Claimant has the RFC to perform light work with added restrictions rather than only sedentary work as in the *Bowie* hypothetical. Her prior work was semi-skilled as opposed to unskilled in the hypothetical. Claimant is undoubtedly literate, as she testified that she sometimes reads for entertainment. [TR 1325.] The lone similarity between her case and the hypothetical is that she worked in a single industry for her entire career, but even this similarity is attenuated at best. Working as a UPS driver is a far less isolated profession than working in the fishing industry.

> Moreover, Claimant's adversities are also less severe than those asserted by the actual claimants in *Bowie* and *Caudill*. The claimant in *Caudill* had prior work experience only as a roof bolter in a coal mine and there was at least some evidence that he was "barely literate." 424 F. App'x at 518. The claimant in *Bowie* could perform only unskilled, sedentary work, just as in the hypothetical [posed in the HALLEX]. 539 F.3d at 396. Yet, in both cases the Sixth Circuit held that these additional adversities were not significant enough to require a borderline age analysis by the ALJ. *Id.* at 401; 424 F. App'x at 517-18.

*Henry v. Colvin*, 2016 WL 1171531, at *9 (E.D. Ky.), *aff'd* 678 F. App'x 392 (6th Cir. 2017).

Here, Plaintiff points to her mental limitations, history of special education, low IQ scores, and right ankle impairment. *See* Doc. 15, at 6. But some of Plaintiff's mental limitations were explicitly considered by the ALJ, and as the Commissioner points out, found to be not persuasive. *See* Tr. 36 ("Moreover, the claimant's attorney argued the claimant was in special education and her IQ was in the 12.05 range, however, she graduated from high school, has worked, raised [a] family of several children, and does all the cooking, cleaning, shopping, and laundry[.]"). Additionally, like the claimant in *Henry*, and unlike the claimant in *Bowie*, Plaintiff here was limited to light, rather than sedentary work. The undersigned finds Plaintiff's alleged "additional vocational adversities" are also "less severe than those asserted by the actual claimants in *Bowie* and *Caudill*." *Henry*, 2016 WL 11171531, at *9.

Further, the ALJ here did not "mechanically" apply the grids to find Plaintiff not disabled, but rather used them as a framework, and considered other limitations and the testimony of the VE. (Tr. 39-40). *See Dultmeyer*, 2014 WL 991900, at *13-14. In this situation, the undersigned finds the ALJ did not err in not explicitly discussing Plaintiff's age. "The fact that age categories are not to be applied mechanically, [ ] obviously does not mean that a claimant must be moved mechanically to the next age category whenever her chronological age is close to that category." *Van der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 528 (6th Cir. 2006); *see Caudill*, 424 F. App'x at 516-18. The undersigned therefore finds no error in the ALJ's determination.

<u>Reviewing Psychologists</u>

Plaintiff alleges the ALJ erred when she assigned "great weight" to the state agency reviewing psychologists' opinions, but failed to explain why she did not incorporate their opinions that Plaintiff was limited to one to three step tasks. The Commissioner responds that any such error

in this regard is harmless. For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Here, the ALJ assigned "great weight" to the opinions of state agency psychologists Drs. Hoffman and Fernandez. (Tr. 37). In so doing, she recognized that both "opined that the claimant appears capable of simple 1-3 step tasks which do not involve[] timed or speeded activities or large production quantities". *Id.*; Tr. 112, 125, 142, 154.The ALJ did not, however, include this specific "1-3 step task" limitation in the RFC, but included the "capacity to remember simple tasks". (Tr. 34).

First, the undersigned notes an ALJ is not required to adopt all limitations in a medical opinion, even one to which she assigns great weight. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides "great weight" to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's limitations wholesale."); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, at *11 (N.D. Ohio) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given great weight.").

Second, the undersigned agrees with the Commissioner that any alleged error in failing to include one to three step tasks in Plaintiff's RFC is harmless. This is so because the housekeeping cleaner job has a reasoning level of one, which correlates to one to two step tasks, and the VE identified what courts have found to be a significant number of jobs in the national economy from that position alone.

The VE in this case identified three jobs a person with Plaintiff's RFC could perform: merchandise marker (DOT #209.587-034, 1991 WL 671802, 280,000 jobs nationally), mailroom clerk (DOT # 209.687-026, 1991 WL 671813, 105,000 jobs nationally), and housekeeping cleaner

(DOT # 323.687-014, 1991 WL 672783, 130,000 jobs nationally). (Tr. 75). The housekeeping cleaner job description identified by the VE includes:

> Reasoning: level 1 – Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

1991 WL 672783. And courts have reasonably concluded that such a reasoning level is consistent with to an RFC limitation to one to two step tasks. *See, e.g.*, *Rodriguez v. Comm'r of Soc. Sec.*, 2012 WL 380275, at *12 (N.D. Ohio) (finding an opinion limiting a claimant to one to two step tasks consistent with reasoning level one).[3]

The VE here identified that the housekeeping cleaner job provided 130,000 jobs in the national economy. (Tr. 75). The Sixth Circuit and district courts therein have found similar and lower numbers of jobs in the national economy "significant". *See Geiger v. Apfel*, 2000 WL 1257184, at *2 (6th Cir.) (table) (75,000 jobs nationally was a significant number); *Phillips v. Astrue*, 2011 WL 5526079 (N.D. Ohio) ("Plaintiff fails to explain how the context of this case based on the record evidence supports the conclusion that 106,000 jobs in the national economy is not a significant number of jobs."); *McPhee v. Comm'r of Soc. Sec.,* 2013 WL 3224420, at *14 (E.D. Mich.) (82,000 jobs in the national economy significant). Notably, Plaintiff, in Reply, did

---

3. This is not to say that claimants limited to one to three step tasks can *only* perform jobs with a reasoning level of one. In fact, the Sixth Circuit has rejected the idea that the Commissioner must align DOT reasoning levels with RFC classifications. *Moneteri v. Comm'r of Soc. Sec.*, 436 F. App'z 434, 446 (6th Cir. 2011). And courts have found no conflict between a claimant being limited to one or two step instructions and the ability to perform jobs of higher reasoning levels. *See, e.g.*, *Russell v. Comm'r of Soc. Sec.*, 2014 WL1333262, at *13 (N.D. Ohio) (finding no conflict between the claimant's limitation to simple one- or two-step instructions and the ability to perform jobs with reasoning level two); *Hall v. Comm'r of Soc. Sec.*, 2010 WL 5621291, at *12 (N.D. Ohio) (rejecting the claimant's contention that ALJ's RFC finding that he was restricted to simple, repetitive one- to two-step tasks is only consistent with DOT reasoning level one).

not respond to the Commissioner's argument that the housekeeping cleaner job alone provided a significant number of jobs.

Further, the undersigned agrees with the Commissioner that Plaintiff's argument on this point—contending that the jobs identified by the VE have seven[4] to eleven steps—conflates steps with tasks. That is, while each job identifies multiple tasks, Plaintiff has not shown those individual tasks to have more than three steps.

Another district court facing a similar argument (in the context of a challenge to the consistency of a VE's testimony with DOT job descriptions) found it unpersuasive. *Brumm v. Colvin*, 2015 WL 4723622 (E.D.N.C.). There, the claimant was limited, in relevant part, to performing "simple[,] routine repetitive tasks involving no more than one or two steps[.]" *Id*. at *2. The VE testified claimant could perform work as a hand packager and laundry worker. *Id*. at *4. The claimant argued the DOT description for hand packager requires an individual to perform at least thirty-two steps. *Id*. The court found the claimant's argument "conflates the number of duties included in the description with the number of steps required for each duty[,]" and observed the "DOT does not specify how many steps are involved in the duties listed in the description." *Id*. Further, the court noted the DOT does not state a hand packager will be required to perform all of the tasks, only "any combination" of the tasks listed therein. *Id*. For these reasons, the court concluded claimant failed to demonstrate a conflict between the VE's testimony and the DOT. *Id*. at *4-5. The undersigned finds the reasoning of *Brumm* persuasive as applied to the facts of this case.

Here, for example, the DOT describes the merchandise marker position:

_____

4. Plaintiff describes the merchandise marker job as involving "as many as six steps". (Doc. 15, at 8) (emphasis in original). However, she identifies seven "steps", using the number six twice. *See id.*, at 9.

> Marks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. May print information on tickets, using ticket-printing machine [TICKETER (any industry); TICKET PRINTER AND TAGGER (garment)].

1991 WL 671802. "Marks and attaches price tickets . . ." describes generally the duties of the position, and then the description provides three tasks associated with the job: 1) "Marks selling price by hand on boxes containing merchandise, or on price tickets"; 2) "Ties, glues sews, or staples price ticket to each article"; and 3) "Presses level or plunger of mechanism that pin[]s, pastes, ties, or staples ticket to article." *Id.* Even assuming these duties are performed sequentially, Plaintiff has not shown any single task requires more than three steps.[5] Additionally, the remaining duties described are all prefaced by the word "may" and do not individually require more than three steps. *Id.* Thus, the undersigned concludes has not shown this job requires any particular *task* that requires more than three *steps*. Similarly, the DOT describes the housekeeping cleaner position:

> Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, ***performing any combination of following duties:*** Sorts, counts, folds, marks, or carries linens. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies. Checks wraps and renders personal assistance to patrons. Moves furniture, hangs drapes, and rolls carpets. Performs other duties as described under CLEANER (any industry) I Master Title.

---

5. And, the undersigned notes, it appears duties two and three simply describe alternative methods by which an individual could attach a price ticket ("[t]ies, glues, sews, or staples price ticket" or "[p]resses level or plunger of mechanism that pin[]s, pastes, ties, or staples ticket to article."). 1991 WL 671802.

1991 WL 672783 (emphasis added). Again, this description describes multiple *tasks* such a worker might need to perform, but does not specifically describe any particular task that requires more than three *steps*.[6]

Because Plaintiff has not shown the outcome would have been different had the ALJ included a limitation to one to three step tasks in the RFC, the undersigned finds any error in this regard harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally ... we review decisions of administrative agencies for harmless error").

Treating Providers

Finally, Plaintiff contends the ALJ erred in her evaluation of Plaintiff's treating providers, nurse Ms. Herwig, and counselor Ms. Dillane.

Under the regulations, a treating physician's opinion is entitled to controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.2007). The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* This rule, however, applies only to treating physicians. Only "acceptable medical sources" can be considered a treating source whose medical opinion may be entitled to controlling weight under the treating physician rule. SSR 06-03p, 2006 WL 2329939, at *1[7]; *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014). Nurses and counselors

---

6. The undersigned need not reach the third job identified—mailroom clerk—because the two jobs above, individually, or combined, provide a significant number of jobs in that national economy.
7. The Social Security Administration rescinded SSR 06-3p effective March 2017. Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5845 (January 18, 2017). Within these same revisions, Advanced Practice Registered Nurses were added

are not "acceptable medical sources" under the regulations. *See* 20 C.F.R. §§ 404.1513(a), (d). Therefore, such opinions are not entitled to the same deference due a treating physician's opinion. *See, e.g., Morales v. Comm'r of Soc. Sec.*, 2013 WL 4780263, at *3 (W.D. Mich) ("There is no 'treating physician's assistant rule' and the opinion of a physician's assistant is not entitled to any particular weight."). Such opinions fall within the category of information provided by "other sources".

The regulations recognize that information from such other sources may be based on special knowledge of the individual and may provide insight into the severity of the impairment[] and how it affects the ability to function." SSR 06-03p, 2006 WL 2329939, at *1.Therefore, opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. The same factors applied to acceptable medical sources apply to opinions form these other sources. *Id.* at *4 (citing 20 C.F.R. § 404.1527(d)) (listing factors of length and extent of treatment relationship, consistency, supportability, how well explained an opinion is, area of specialty, and "[a]ny other factors that tend to support or refute the opinion."). "[T]he Commissioner has broad discretion in weighing such an opinion" from a non-acceptable medical source. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

Preliminarily, neither Ms. Herwig nor Ms. Dillane is an "acceptable medical source" under the regulations. *See* 20 C.F.R. §§ 404.1513(a), (d). As such, SSR 06-03p, 2006 WL 2329939 provided the appropriate framework for evaluating their opinions.

---

to the list of acceptable medical sources. *See id.* However, the undersigned must apply the rules in effect on the date of the ALJ's decision. *See id.* (noting new rules apply to claims filed after March 2017).

*Ms. Herwig*

The ALJ described the weight assigned to Ms. Herwig's opinions:

> Additionally, the undersigned gives little weight to Grace Herwig, APRN, who opined the claimant had no useful ability to function in multiple functional areas, had marked limitations in activities of daily living and social functioning, and extreme limitations relative to concentration, persistence, and pace (6F/2-5, 12F). Ms. Herwig is not considered an acceptable medical source, but was still considered pursuant to SSR 06-03p with respect to knowledge of the claimant's ability to function. Additionally, she provided little to no treatment notes to support her opinion and instead relied on a check the block form with little explanation. Furthermore, her statements appear extreme given the fact that the claimant had some good objective examination findings, such as alert and oriented time four with a coherent and logical thought process, pleasant and interactive behavior, normal speech, bright mood and affect, good short-term memory, able to perform simple calculations, accurate in doing serial 7's, appropriate insight, appropriate judgment, normal psychomotor activity, and no indication of suicidal or homicidal ideations (3F/5, 8F/17).

(Tr. 38).

The undersigned finds no error in the ALJ's evaluation of Ms. Herwig's opinion. In evaluating the opinion, the ALJ touched on the regulatory factors of consistency and supportability. First, the ALJ relied on the fact that Ms. Herwig "provided little to no treatment notes to support her opinion and instead relied on a check the block form with little explanation." Tr. 38). This is a valid reason to discount an opinion. *See e.g., Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) ("Many courts have cast doubts on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings ....") (quoting *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011)); *see also Mason v. Shalala*, 994 F.2d 1058, 1065–66 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. ... [W]here these so-called reports are unaccompanied by thorough written reports, their reliability is

suspect.") (internal citations and quotation marks omitted); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). This is not to say that Ms. Herwig had not provided treatment notes, but rather than she did not explain in her assessments how those treatment findings correlated to the opined restrictions.

Second, the ALJ noted Ms. Herwig's assessment "seem[ed] extreme given the fact that [Plaintiff] had some good objective examination findings". (Tr. 38). This directly addresses the consistency of the opinion in the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Although the ALJ only cited two records in support of this statement, *see* Tr. 38 (citing Tr. 356, 429), the statement is supported by substantial evidence in the record. Ms. Herwig's own treatment notes do not support such extreme limitations. *See* Tr. 404 (January 2014 notation that Plaintiff's mood was "improved, with less crying and less anger and irritability"); Tr. 399 (March 2014 notation that Plaintiff "look[ed] brighter" and reported improved mood); Tr. 577 (May 2014 that Plaintiff was socializing and leaving her house more); Tr. 575 (July 2014 note that Plaintiff thought counseling and medications were helping, she was outside more, and had taken the bus to her appointment); Tr. 573 (September 2014 report of mood improvement); Tr. 568 (November 2014 notation of "much improved" mood); Tr. 566 (March 2015 notation that Plaintiff had taken the bus alone and "enjoyed it"). These records, although they also show ongoing problems, do not support the "extreme" (as the ALJ described them, Tr. 38) limitations to which Ms. Herwig opined. Ms. Herwig's assessment was also inconsistent with the

opinions offered by state agency physicians, and consultative psychological examiner to whom the ALJ assigned "great weight" and "some weight", respectively. (Tr. 37).This, thus, was a valid reason to discount her opinion.

### Ms. Dillane

The ALJ explained the weight assigned to Ms. Dillane's opinion:

> [T]he undersigned gives little weight to the opinion of treating provider Brenda Dillane, LPCC., who opined the claimant is unable to meet competitive work standards in multiple functional areas, would be absent from work 3 times a week, and would be off task 40-80 percent of workday (11F). She treated the claimant twice a month starting June 19, 2014, which was 4 years after her alleged onset date. Her statement[s] appear extreme given the fact that the claimant had mostly unremarkable mental status evaluations, such as being alert and oriented time four with a coherent and logical thought process, pleasant and interactive behavior, normal speech, bright mood and affect, good short-term memory, able to perform simple calculations, accurate in doing serial 7's, appropriate insight, appropriate judgment, normal psychomotor activity, and no indication of suicidal or homicidal ideations (3F/5, 8F/17).

(Tr. 38).

As with Ms. Herwig, the undersigned finds no error in the ALJ's evaluation of Ms. Dillane's opinion. The ALJ's statement that her opinions "appear extreme" given record findings (Tr. 38) is supported by substantial evidence much for the same reasons described above in relation to Ms. Herwig's opinion. Ms. Dillane's own treatment notes reflect many of the positive findings cited by the ALJ. *See* Tr. 641 (July 2014 note that Plaintiff was "not so depressed" and spending more time outside her room); Tr. 634 (August 2014 noting improvement and that Plaintiff was "[v]ery pleased with her ability to take bus and her literacy classes."); Tr. 630 (September 2014 note that Plaintiff acknowledged her progress over the past year); Tr. 613 (February 2015 note that Plaintiff's medications were working better; she had fewer bouts of tearfulness; and she was still hearing voices "but they are very low"); Tr. 604 (May 2015 note that Plaintiff was attending

college and it as "going ok", and that she was taking math and culinary classes, and volunteering at the library); Tr. 601 (June 2015 note that Plaintiff's mood "appeared bright" and she was alert and oriented); Tr. 680 (July 2015 note that Plaintiff was alert and oriented, mood was stable, and Plaintiff was getting help with reading and taking culinary classes); Tr. 686 (August 2015 note that Plaintiff was "pleasant, cooperative, and engaged in the therapeutic process, alert and oriented, and had a stable appearing mood); Tr. 690 (September 2015 note that Plaintiff was alert and oriented with a stable mood); Tr. 692-97 (notes form three visits in October 2015 where Plaintiff was alert and oriented, with a stable (or improved) mood); Tr. 696 (October 2015 note that Plaintiff was "pleasant, cooperative, and engaged in the therapeutic process"). These notes stand in contrast to Ms. Dillane's July 2015 assessment that Plaintiff had no useful ability to function in the area of following very short and simple instructions, and that she was unable to meet competitive standards in areas such as maintaining regular attendance, or performing activities within a schedule. *See* Tr. 487. Specifically, Plaintiff was attending medical appointments and classes on a regular schedule. Notably, as the Commissioner points out, at a visit on the same date as Ms. Dillane's opinion, Ms. Dillane noted Plaintiff was alert and oriented, her mood was stable but "a bit depressed", and she was "pleasant, cooperative, and engaged in therapeutic process." (Tr. 682).

Plaintiff briefly asserts that the ALJ should have re-contacted Plaintiff's providers, arranged for an additional consultative examination, or enlisted a medical expert. (Doc. 15, at 25). However, an ALJ is only obligated to obtain additional evidence if the evidence before her is insufficient to make a determination. *See* 20 C.F.R. § 404.1520b. Similarly, an ALJ has discretion in determining whether to call a medical expert. *Simpson v. Comm'r of Soc. Sec.* 344 F. App'x. 181, 189 (6th Cir. 2009) (noting the regulations "provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony"); *see also Foster v. Halter*, 279 F.3d

348, 355 (6th Cir. 2001) ("An ALJ has discretion to determine whether further evidence, such as additional testing, or expert testimony, is necessary."). "[G]iven the breadth and depth of the evidence in the record, and this Court's deference to the ALJ in deciding whether the record is fully developed", *Simpson*, 344 F. App'x at 189, the undersigned finds the ALJ did not err in not further developing the record.

Finally, with regard to both providers, the undersigned reiterates that as non-acceptable medical sources, and thus not treating physicians, the ALJ was not required to provide the same "good reasons" she is required to supply for such providers. SSR 06–03p ... does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion [,]" as the ALJ must do when discounting an opinion by a treating source. *York v. Comm'r of Soc. Sec.*, 2014 WL 1213240, at *5 (S.D. Ohio) (citations omitted); *see also Clark ex rel. S.R.C. v. Comm'r of Soc. Sec. Admin.*, 2013 WL 3007154, at *9 (N.D. Ohio) ("An ALJ is not required to set forth good reasons for rejecting the opinion of a social worker."); The ALJ had "broad discretion in weighing such an opinion", *Brown*, 591 F. App'x at 451, and did not err in the exercise of that discretion here.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.


  s/James R. Knepp II
United States Magistrate Judge